Okay, we'll call 19-1269 Place v. Anderson. Mr. Davis, if you would please proceed. My name is Damon Davis, Counsel for Appellant. May it please the Court. Appellant is asking this Court to reverse summary judgment for defendants. I'll turn straight to the key issue in this case, which is the constantly shocking nature of defendants' conduct. This Court has said there's no set formula for what constitutes conscious shocking conduct, but we can look at prior cases to guide the analysis and help weigh such conduct. These cases tell us that you look at the totality of each defendant's conduct, but also that you can look at specific concerning facts to help illustrate that conduct. We could do the same thing here. For the pre-hearing conduct, which involved all three defendants, six specific facts help illustrate that their placement recommendation was conscious shocking. One, they knew that Angel was happy, thriving, and meeting her milestones with Blackwell. Two, they knew that White and Bond were both abused as children, with White's abuse continuing through her teenage years and even into adulthood. Three, they knew that White was physically abusive toward her mother, which is similar to the T.D. case where father was abusive toward another family member. Four, they knew that White had four psychosocial factors that could or would severely impede safe or effective family functioning. Five, they knew that White had untreated mental health issues, including an admitted need for counseling. And six, they knew that White and Bond fought almost daily, sometimes with screaming and yelling. A reasonable jury could conclude that their recommendation in the face of these facts and the others set forth in the brief was conscious shocking. For the placement hearing and post-hearing conduct of Defendant Stewart, six additional facts help illustrate the conscious shocking nature of her conduct. One, she did not tell the magistrate that White was under 21 but did not have an age waiver. That's similar to the Currier case, not telling the court about father's financial irresponsibility. Two, she did not tell the magistrate concerning information about Bond and White, despite having the opportunity. That's similar to not volunteering information in the Currier and T.D. decisions. Three, she did not investigate Angel coming home sunburned, hungry, dirty, and being unhappy and withdrawn out of antipathy for Blackwell. That's similar to the B.I.C. case. Four, she did not investigate White's report that Angel was bruised running into a kitchen counter when Angel could not even yet crawl. That's similar to the failures to investigate in Currier and Johnson. And five, she failed to significantly intervene when the August 20th meeting showed that Angel had deteriorated. A reasonable jury could find that Stewart's conduct in these instances and the other instances was conscious shocking. And all three defendants' conduct was at least as conscious shocking as that in Currier, Johnson, and Armijo. So summary judgment on this basis should be reversed, and at this time I invite any questions from the court. Thank you, counsel. This is Judge Hart. Do we have any guidance on what it takes to be conscious shocking in this specific context? Generally, the cases, I believe, say that under the special relationship doctrine in this context, we look to see whether the social workers exercise professional judgment. Is that also the principal factor in determining conscious shocking under the state-created danger theory? And if not, why would there be any difference there? I believe that there's a slight difference with the danger creation. You're also looking at the nature of the danger you're putting the child into, and it only goes toward up to the point that you put the child into danger, whereas with the special relationship you're looking at the entirety of the relationship. But I think that does factor probably into both, at least when you're dealing with professionals like social workers and what they would be expected to know about the danger based on their professional judgment. And here we have evidence that they failed to exercise or that they even advocated their professional judgment based on the expert reports from plaintiff's experts. To make sure, you seem to be agreeing that if they did exercise professional judgment, then they would not be liable under either theory. Your point here is they did not exercise professional judgment. If I understand you correctly. Well, I don't think exercising professional judgment is an element of the danger creation. I think it would perhaps illustrate or help color whether they should have recognized or did recognize the danger, whether it would be obvious to them in their professional capacity. But I think the elements there are somewhat different. And in that case, did they recognize the danger? I think that's a separate element from the failure to exercise professional judgment, but the knowledge they would have as a professional would, I think, impact whether the danger was obvious to them. I don't know if that helps clarify what I'm saying. Let me ask specifically about the failings of the defendants after the placement. There's a question whether the claims of misconduct before the placement, their participation in the hearing that led to the placement, whether that's barred by Rooker-Feldman or perhaps through some other doctrine such as preclusion. So I'd like to focus for a moment at least just on the misconduct that you're alleging after the placement. You mentioned not following up on the report that the child had walked into a counter. Were there any other failings during the period of time after the placement? Well, after the placement, you have the-it's mostly Defendant Stewart after the placement. You have her developing, along with Dahl, an improper, hastily expedited transition plan. Plaintiff's experts state that it was unnecessarily and unreasonably hastened, which put additional pressure on White and the child and didn't give enough time for the child to adapt and to assess the situation. You also have the complaints by Blackwell during the transition. She would report that Angel was coming home sunburned, hungry, dirty, that she was unhappy and withdrawn. Those were not investigated, and instead Stewart said, well, look, she's just trying to sabotage the transition. So you have that failing. You have the running into the counter example. That was not investigated. And it's important to note that a similar complaint was what caused the placement to be investigated in the first place. It was investigated because they said, well, Angel got a bruise rolling off the couch. She couldn't roll over yet at that time. She wasn't old enough. They investigated that promptly. You have similar and similar here. And it wasn't investigated. And then you also have the continuing, during these meetings in July and August, a continued deterioration of Angel. And it's particularly evident at the August 20th meeting. The defendant even noticed that, you know, look, Angel seemed to be doing better when we first brought her here. She's whining hysterically, getting upset for no reason, sitting in the corner and rocking and whining. And there's no prompt intervention. They don't move to take the child away. They don't move to maybe go back into a transition. They don't insist that White get immediate counseling. And White at this period is asking for help. She's saying, hey, I need help. This is overwhelming. And that wasn't promptly provided. And that was an abdication of her responsibilities. And it's important to note, you have to consider everything she knew going into this. Outweigh Angel. Do you have any counsel? Judge Matheson, do you have questions? Yes, I have a couple of questions about Defendant Stewart, Ms. Stewart. What did she do? What was her relevant conduct before she testified at the placement hearing on June 17th? I just want to make sure I'm not missing something. Was there anything before she testified that we should be concerned about? Mostly it arises out of her testimony. She was involved. She did visit Angel a couple of times with Blackwell and said that Blackwell was doing fine. She had no concerns with how Angel was developing with Blackwell. But her conduct for our purposes, for our concern, really has to do, starting with the hearing, where she recommended to the judge that Angel be transferred. All right. So let me turn to the hearing. There's a suggestion that she might have misled the judge about the safe house study. But my question is how that could be when the judge started the hearing by saying he had read the report. Well, I think there's two particulars. He did indicate that he had reviewed the report at some point since May 2nd, which was a couple months earlier than the hearing, so it's not clear how much he or how thoroughly he read it or how much he remembered or if he understood the import of everything that was in there. I think it's important that, one, she didn't point out the absence of an age waiver, or the absence of an age waiver. White was under 21. She didn't point that out or point out that there was no age waiver. Instead, she just said that White was approved to be a foster parent. And, two, she didn't call the information to the magistrate's attention. I think it's important in the Currier case, this court said, look, it goes to conscious shocking conduct that Garan did not point out that father was financially irresponsible, but that information was already in the record because a different social worker in Currier had put it in the petition to remove the child. So the social worker still has the obligation to call that information to the attention of the place in court. I understand your point. One last question about Ms. Stewart, and this has to do with the danger creation theory, not the special relationship theory, but the danger creation theory. Why wasn't the district court correct that she can't be held liable under danger creation for her conduct after the court hearing because she didn't engage in affirmative danger of creating conduct? Did you disagree with the district court's analysis on the danger creation theory as to Ms. Stewart? A little bit. I think she did engage in affirmative conduct through helping design the transition plan and then for not making adjustments to that plan despite being requested to do so by Blackwell. This court looked at Currier if inaction, if it's tied to action, or prior action or subsequent action can be part of danger creation. So I think that goes up to the point of where the transition was completed. I think once the transition's completed and Angel's full-time with White and Bond, at that point I think the court is correct. Thank you. Judge Carson? I don't have any questions. Thanks. If there are no more questions, then I'll reserve the rest of my time. Very good. Thank you, counsel. Mr. Klaus? Thank you, Your Honor. Can you hear me? Yes. I'll just switch from mute. Okay. My name is Andrew Klaus. I represent the appellees Joyce Anderson, Joni Bedell, and Crystal Stewart. May it please the court, we are asking this court to affirm the district court. I'm going to go very quickly and then open up to questions because counsel has raised a lot of questions, which I'd like to respond to. But let me just say this is what we see the case is about. This is a case where all the appellees did what they were supposed to. A diligent search was done. A home study was done. Kin was properly considered. An attachment assessment was done. The decision went to a full placement hearing. The transition plan ordered by the court was created and followed, and the placement was properly supervised. All of these appellees made difficult recommendations based on the facts and their experience. They followed policies and practices. There were no material omissions, and they exercised their professional judgment. Now, professional judgment can differ from professional to professional, but it cannot be said that they abdicated their professional judgment or they did not behave in a way that was not conscience-shocking. There just is no conscience-shocking behavior here. When you look at all the cases that counsel cited, all of those involve things like repeated abuse, repeated referrals that go uninvestigated, deliberately hiding facts from the court out of a fear for a job. Multiple instances of failure to follow policy. Instances where the social workers didn't do supervisory visits. Here they did everything they were supposed to do, and, in fact, in many cases, as pointed out in our brief, they did more. It really comes down to did they do their best based on what they were observing firsthand to exercise professional judgment, and they did. Let me, if you'd like, why don't I just open it up to questions because I suspect you have a few. Well, this is Judge Hart. Mr. Davis mentioned a few things that he alleges were not followed up, which could be an application of professional judgment or professional responsibility, and can you address some of those? The one that I recall seeing anything in the brief about was this ridiculous statement that the child had, I thought it was hurt herself playing tag or bumped into a counter when she wasn't, she couldn't physically have done that. What response do you have for the failure to follow up on those things? So let me address this in two different manners. First, with respect to that incident, this was something that was self-reported during a phone call with the foster kin mother, Ms. White. She talked to Stewart on various occasions on the phone, in addition to the various in-person visits that took place over the two months. This involved a phone call where she called into Ms. Stewart and said, what should I do? The child hit her head and bumped into a counter playing tag. I don't know that it matters whether the child could crawl or not because we don't know the facts. What we do know is Ms. Stewart talked to her and within several days, I don't think it's more than a week, she's out there for a personal visit anyway. The other allegations that were mentioned were that the child came back from transition visits, sunburned, dirty, hungry, that sort of thing. There were, in every instance, DHS workers who were there observing things when the child was turned back over from a transition visit. What is important is when there were serious allegations raised, such as abuse that was reported, a bruise that was reported by Ms. Blackwell, or indications that there was an... Go ahead. Excuse me for a minute. I want to make sure I understood that. Did the workers, case workers who were present during the transition between Blackwell and White, did they disagree with Blackwell's assessment of being dirty and sunburned? There's no record that any of them noticed the sunburn or the dirty or the hungry. In any event, Your Honor, I don't know that those are the kinds of dangers. I mean, kids get sunburned. They get hungry. I think what's important is, as I was saying before, when there were instances that were significant of abuse, they were investigated. When there was the bruise incident, and that's not in Appellant's brief, but it was something that Judge Kane relied on when he looked at the totality of the circumstances, which I think is what you have to do when dealing with professional judgment and conscience-shocking behavior. Those instances were investigated and resolved. In one case, even the police got involved. So all of those were proven discredited, if that answers your question. Thank you. Judge Matheson, do you have a question? Yes, counsel. Did the Mesa County DHS retain legal custody over the child during the time she was placed with Mr. Bond and Ms. White? Yes. They had not yet formalized the process where the child was taken from the birth parents. So I don't know exactly what you mean by legal custody, but the child was in their custody. That's not disputed. They were doing the supervisory functions during that time period. And the father, the birth father at that time, was still going through the state court appeal process. He wanted the child back. That had not yet been resolved. That was another reason why the Ken was considered in case the child needed to go back to the family member. One other point, just if I can jump back to Judge Hartz's question, and that is if you look at the Gutteridge case that's been cited in our brief, that talks about an instance where the child, I think, falls back in a bathtub and gets a bruise, and the court specifically said that was not enough to indicate any kind of lack of professional judgment or conscious shocking conduct. I apologize for jumping back, but I wanted to put that out there. Just one other thing, counsel. On the question of danger creation, your opposing counsel has argued that we need to look at the conduct of each defendant as a whole. Do you agree with that? No. You cannot look at the conduct of each defendant as a whole. Well, I take that back. You can certainly look at the conduct of each defendant. For example, you can look at all of Ms. Stewart's conduct or all of Ms. Johnson's conduct, but you cannot aggregate that, and that's the Hubbard case. You can't aggregate that into putting it all together and putting it on one defendant or the other. They have to stand on their own. But, yes, you can look at all the things they did. Thank you. Judge Carson? Yeah. How does it play in here in the agency personnel performing their job that they have the Colorado law giving a preference to kin as opposed to, you know, who they'd like to place the child with, all things being equal? Yes, yes, and I anticipated that question. So the way it works is, first of all, in the Colorado regulations, which govern the counties, the first thing that they have to do, and that is mandatory, is do something called a diligent search. That has to start within three days, and they are required to go out and try to find different kin placement options. That then continues every six months throughout the life of the case while they retain custody. So the question then becomes, it's clear that they definitely have to look for kin. So there's also what's called a kin preference that then shows up in the regulations, and this is both national, state, and local. And the question I think you're asking is, what does a, quote, kin preference mean? A kin preference means that you have to consider the kin. There are many good reasons for that. It minimizes trauma down the road. It increases a sense of belonging. It increases stability and permanency. There are fewer placement changes. Children express more positive feelings. There are all these different factors. But in terms of is there a bright-line test that says you have to place it with the kin if there is one, there's not. Instead, it's a totality of the circumstances. In other words, everything goes into the mix. Is there a kin? Do the kin have kids? What's the relationship? Is there an attachment bond to the first foster parent? That's why they did an attachment assessment. What are the red flags of the potential kin placement? What are the green flags? Is the foster child doing well? Do the birth parents prefer kin over non-kin? What are the chances that the child might be returned to the birth parents? All these things go into the mix. So there is no bright-line test that says you have to do it. Instead, you're required to consider it and give a preference if it makes sense and if it is in the child's best interest. And that was done here. That is a professional judgment. Different professionals can disagree. But it does not mean that it's constant shocking. It does sound like you anticipated that. I did, because it was a question I had when I got the case. Any other questions? Anything on Rooker-Feldman that I can address before I turn it back over to my counsel? Well, if you'd like to take on that Rooker-Feldman, I'm sure you can totally clarify that doctrine for us here. I will do my best, but I know, Judge Arch, you've written many opinions on it. But we, first of all, I want to point out, because it does show up in appellant's brief in a significant fashion, I want to point out that Judge Koehn does not decide what we'll call the first part, which is the placement recommendation, based solely on Rooker-Feldman. He also decides it based on the lack of constant shocking or abdication of professional judgment behavior. So the first point I want to make is this case and our position is not based on Rooker-Feldman. Where Rooker-Feldman comes into play is that if you look at what the appellant seemed to be doing with the placement, is they're saying, we disagree that the placement was in the best interest of the child, and we disagree that the child should have been moved from Miss Blackwell to the Kin family. So to us, and they raise issue preclusion and that sort of thing, to us, this really, and I want to run out of time, this really comes down to that is why we chose to go this way rather than the preclusion. I don't disagree that preclusion should also apply. But here, if you go through, the test, I think, is best laid out in the Campbell case. It is, and the idea is, what does it mean by inextricably intertwined? It's a claim brought by the state court loser complaining of an injury caused by the state court judgment. Here, the injury, we believe, was caused by the state court decision. That's the decision that placed the child with Miss White, who ultimately killed the child. If we can't go that far, then there's a definite proximate cause problem with any of the appellees being responsible, because they're one further step removed. I can go on, but I know that my time is probably out. If you have any questions on that, I'm happy to answer them. Thank you. I'm a little confused on time, Mr. Wyman. Was that bell, the final bell, did you ring? No, no, Your Honor. That was the three-minute warning, so 1.43 left on this side. Okay, then if I could just then touch on what you all talked about earlier, which was Miss Stewart's conduct. After the placement, you have six different visits. Some happen in the home, one happens in what we call the lobby of DHS, which is actually a lobby that has different breakout rooms and spaces for privacy, and I think one happens at a Target or something like that. Many of these visits involve two different social workers, someone named Connie Mercer and Miss Stewart. They both go out. They're both talking about the case. They're both making first-hand observations. I think counsel mentioned that there were concerns in August that Miss White was having trouble. Miss Dahl, who is an independent person also at DHS, but she's a counselor, she's brought back in, so you now have a third person. They're all talking about this. They're all making observations. The key here is, and by the way, Mr. Bond, who's living in the house as the husband of Miss White, he's testified he doesn't see anything. Miss White's mother, who's there almost every day helping, doesn't see anything. The key here is, if I can just finish, is that there is no clear indication to any of these people that the child is in harm's way or that there's any imminent danger. There's nothing out there where she says, I'm going to kill the child, or someone else makes a referral that the child is being abused. It's all just a judgment. You have not one, not two, but three different experienced social workers that are talking about this, and they all make the judgment. Any one of them could have pulled her, but they didn't. I apologize for going over my time. Thank you, Counsel. Thank you. Does Mr. Davis have more time? He does, Your Honor, one minute and 19 seconds. If you'd like to use that, Mr. Davis, please proceed. Briefly, Helen agrees that you can't aggregate the conduct of the defendants together, but in this case all three defendants knew the same information and all three made the same recommendation, so that can be considered. With regard to running in the counter, yes, White self-reported that, but she came up with an excuse at the exact same time, and the visit wasn't until eight days later. The report was July 16th. The visit was July 24th. With regard to Rooker-Feldman, I think the Kovacic case applies. We can't overturn the judgment or even try because Angela is deceased. And with regard to the placement recommendation, that's pre-decision conduct, which this court in Campbell and also the Kovacic case said is not covered by the Rooker-Feldman doctrine. Even if the court later approves that conduct or approves the recommendation, that's in accord with other cases of this court. Overall, you have to look at all of the factors, and our Mio case I think is important because you have to look at the mental health factors, especially that White had, and whether those present a risk to the child. In that case, it was sending the child home with those factors. In this case, it's sending the child to someone with those factors. And if that shocked the conscience in our Mio, then it certainly shocks the conscience here. With that, I thank the court. Thank you, counsel. Case is submitted. Counsel are excused.